<u>**NOT FOR PUBLICATION**</u>

<u>**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**</u>

_____
                                                    :
DAVID FONT,                                :
                                                    :
            Plaintiff,                         :
                                                    :            Civil Action No. 07-6032 (JAG)
            v.                                   :
                                                    :                    **OPINION**
COMMISSIONER OF SOCIAL          :
SECURITY ADMINISTRATION,       :
                                                    :
            Defendant.                       :
_____:


<u>**GREENAWAY, JR., U.S.D.J.**</u>

Plaintiff, David Font ("Plaintiff"), pursuant to 42 U.S.C. §405(g),[1] seeks review of the

Social Security Commissioner's (the "Commissioner") decision denying his application for

Supplemental Security Income ("SSI")[2] and Disability Insurance Benefits ("DIB")[3] for the period

_____

[1]  This section of the Social Security Act ( the "Act") provides that any individual who
was a party to a hearing before the Secretary may commence a civil action within 60 days after
the Secretary's final determination.  The appropriate forum for this action is the district court of
the United States judicial district in which Plaintiff resides.  42 U.S.C. §405(g).

[2]  Supplemental Security Income is a national program that provides supplemental
security income to individuals who have attained age 65 or are blind or disabled.  42 U.S.C.
§1381.

[3]  Disability Insurance Benefits are awarded only when a claimant with a sufficient
number of quarters of insured employment has suffered such a mental or physical impairment
that the claimant cannot perform substantial gainful employment for at least twelve months.  20
C.F.R. §404.1520.

1

from July 1, 1996 until April 20, 1998.[4]  Plaintiff asserts that the Commissioner's decision is not supported by substantial evidence, as required by § 405(g), and that the Commissioner erred in law and fact in denying his applications.[5]  For the reasons set forth below, this Court finds that the Commissioner's decision is supported by substantial evidence and shall be affirmed.

## I. PROCEDURAL HISTORY

On October 1, 1996, Plaintiff filed an application for DIB and SSI, claiming disability from the effects of a Human Immunodeficiency Virus ("HIV") infection.  (Tr.[6] 51-60; Compl. ¶ 5.)  Subsequently, Plaintiff's applications were denied at both the initial and reconsideration levels.  (Tr. 28-40; Compl. ¶8.)  On January 21, 1998, Plaintiff then appeared before Administrative Law Judge Marilyn Mann Faulkner ("ALJ Faulkner").  (Tr. 45.)  On August 13, 1998, ALJ Faulkner issued a denial of benefits.  (Tr. 138-43.)  Plaintiff then sought Appeals Council (the "Council") review.  (Tr. 152.)  The Council remanded the case on October 13, 2000, with instructions for the ALJ to obtain expert medical evidence, to evaluate Plaintiff's subjective

---

[4] Hereinafter this cumulative time period will be referred to as the "time period in question."

[5] While this Court encourages vigorous advocacy, it does not approve of incivility.  The Plaintiff's brief was a vitriolic attack on the remand procedure in general, and, at times, the Administrative Law Judge.  As a result, the brief failed to advocate for the substance of Plaintiff's position.  In fact, only six pages of the fourteen pages of the Argument section of Plaintiff's brief are devoted to the substance of Plaintiff's claims.  Contrary to what Plaintiff's brief suggests, the Administrative Law Judge conducted a thorough reconsideration on remand and issued a complete and well-considered decision.

[6] The Act instructs the Secretary to file, as part of the answer, a certified copy of the transcript of the record, including any evidence used to formulate the conclusion or decision.  42 U.S.C. § 405(g).  " Tr." refers to said transcript.

complaints further, to give greater consideration to residual functional capacity ("RFC"),[7] and to obtain evidence from a vocational expert to determine the effect of Plaintiff's limitations on his ability to perform his prior occupation as a courier.  (Tr. 154-56.)

On February 19, 2001, ALJ Dennis O'Leary ("ALJ O'Leary") held a hearing, pursuant to the Council's remand. On March 29, 2001, ALJ O'Leary  issued a decision that found Plaintiff was not disabled during the time period in question, but was disabled from April 21, 1998 onwards.[8]  (Tr. 18-23.)  Plaintiff appealed the partial denial of benefits.  On January 8, 2003, the Appeals Council determined that it lacked a legal basis for reviewing ALJ O'Leary's decision. (Tr. 9-10.)  On December 1, 2004, this Court remanded the case after determining that ALJ O'Leary's ruling did not: use substantial evidence; properly assess RFC; properly evaluate Plaintiff's subjective complaints of pain; and address step five of the evaluation process.[9]  (Tr. 393-411.)  On June 29, 2005, the Appeals Council issued a remand order and on October 25, 2005, ALJ O'Leary held a second hearing.  On January 6, 2006, ALJ O'Leary issued an

---

[7] RFC is an assessment to determine what work activities the claimant can perform despite his or her impairment(s).  20 C.F.R. § 404.1545(a) (2003).

[8] In distinguishing the two time periods, ALJ O'Leary relied upon documentation from Plaintiff's April 21, 1998 visit to the Raritan Bay Medical Center, where he was hospitalized for two weeks and diagnosed with numerous ailments, including pneumonia and his previously diagnosed HIV.  (Tr. 20.)  ALJ O'Leary determined that during the time period in question, medical evidence did not support a finding of disability and Plaintiff's RFC rendered him capable of performing "a full range of sedentary work."  (Tr. 21.)

[9] The Commissioner has promulgated a five-step evaluation process to determine whether an applicant is "disabled" within the meaning of the Act.  See 20 C.F.R. § 404.1520;  See generally Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  At step five, the Commissioner must show that Plaintiff's RFC allows for the performance of  "other work" which "exists in substantial numbers in the national economy."  20 C.F.R. §§ 404-1520(f), 416.920(f), 404.1561, and 416.961.

unfavorable decision. (Tr. 382-91.) In that decision, ALJ O'Leary determined that during the

time period in question Plaintiff had an RFC of medium work[10] and therefore was ineligible for

DIB and SSI. (Tr. 389-90.) The following is a summary of his findings:

1.  The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 1999.

2.  The claimant has not engaged in substantial gainful activity since July 1, 1996.[11]

3.  From July 1, 1996 to April 20, 1998, the claimant's Human Immunodeficiency Virus (HIV) infection was a "severe" impairment, based upon the requirements in the Regulations (20 CFR [sic] §§ 404.1520 and 416.920).

4.  From July 1, 1996 to April 20, 1998, this medically determinable impairment did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations from July 1, 1996 to April 20, 1998 are not totally credible for the reasons set forth in the body of the decision.

6.  For the period of July 1, 1996 to April 20, 1998 the claimant retained the ability to occasionally lift and/or carry fifty pounds and, frequently, lift and/or carry up to 25 pounds frequently [sic]; he could stand and/or walk

---

[10] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567.

[11] Substantial gainful activity is work that is substantial and gainful. 20 C.F.R. §§ 404.1572 and 416.972. Substantial activity is defined as work activity that involves significant physical and mental activities. Work may be substantial even if it is done on a part time basis, or even if the individual does less, gets paid less, or has less responsibility than when he or she worked before. 20 C.F.R. §§ 404.1572(a) and 416.972(a). Gainful work is work activity performed for pay or profit. Work activity is considered gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b) and 416.972(b).

about 6 hours in an 8-hour workday and could sit with normal breaks for a total of about 6 hours in an 8-hour workday. However, the claimant's ability to perform work during this time period was limited in that he should avoid concentrated exposure to extreme cold and heat; wetness, humidity and pulmonary irritants. Thus, the claimant retained the residual functional capacity during this time period to perform a full range of medium work (20 CFR [sic] §§ 404.1567 and 416.967).

7.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment during the time period at issue (20 CFR [sic] §§ 404.1565 and 416.927).

8.      During the time period at issue, the claimant's past relevant work as a courier did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR [sic] §§404.1565 and 416.965).

9.      From July 1, 1996 to April 20, 1998, the claimant's medically determinable Human Immunodeficiency Virus infection did not prevent claimant from performing his past relevant work as a courier.

10.     From July 1, 1996 to April 20, 1998, the claimant was not under a "disability" as defined in the Social Security Act (20 CFR [sic] §§ 404.1520(g) and 416.920(g)).

(Tr. 390-91.)

Based on these findings, ALJ O'Leary concluded that Plaintiff was "not entitled to a period of disability, [DIB], and not eligible for [SSI] payments under Sections 216(i), 223, 1602, and 1614(a)(3)(A), respectively, of the Social Security Act for the time period [in question]." (Tr. 391.)  Subsequently, on October 26, 2007, Plaintiff sought review by the Appeals Council. The Council deemed that it had no grounds for review.  (Tr. 371-75.)  On December 19, 2007, pursuant to 42 U.S.C. §405(g), Plaintiff sought review in this Court.

## II. STATEMENT OF FACTS

### A.   Background

Plaintiff, David Font, was born on September 13, 1959 and has a tenth grade education. (Tr. 171, 220.)  From 1989 to 1994, he worked as a courier and, intermittently, as a warehouse worker.  (Tr. 67.)  He was incarcerated from July 1994 through July 1996.  ( Id.)  In his October 1, 1996 disability report, Plaintiff recounted that as a courier, he was required to drive a van and deliver packages and documents to law offices in Newark, N.J.  (Tr. 69, 72.)  On average, the position required five hours of walking, three hours of sitting, frequent bending and reaching, and no standing, lifting, or carrying.  (Tr. 70.)  In his October 22, 1999 disability report, Plaintiff recounts that as a courier he sat for five hours per day, stooped for one hour per day, and handled, grabbed, or grasped big objects for one hour per day.  (Tr. 215.)  He also indicated that in some instances he delivered fifty pound bins.  (Id.)  Plaintiff claims that his disability began upon his release from prison in July 1996.  (Tr. 18.)  At the time of his release, Plaintiff was taking the following medication: Zerit,[12] Atarax,[13] Bactrim,[14] and Motrin.[15]  (Tr. 91.)

---

[12] Zerit is "an anti-HIV medication that prevents HIV from altering the genetic material of healthy T-cells.  This prevents the cells from producing new viruses and decreases the amount of viruses in the body."  AIDSmeds.com, http://www.aidsmeds.com/archive/Zerit_1588.shtml.

[13] Atarax is the "trademark for an antianxiety, antiemetic, and anticholinergic."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 141 (6th ed. 2002) [hereinafter "MOSBY'S"].

[14] Bactrim is "used to treat different types of infection caused by bacteria."  Drug Information Online, http://www.drugs.com/bactrim.html.

[15] Motrin is "a brand name for the generic drug ibuprofen that is used to manage mild to moderate pain, fever, and inflammation."  MedicineNet.com, http://www.medicinenet.com/ibuprofen/article.htm.

**B.** **Medical Evidence**

The record indicates that on several occasions physicians evaluated Plaintiff.

**1.** **Dr. Nsyedau H. Rizvi**

On October 15, 1996, Dr. Rizvi of the Newark Community Health Center reported that Plaintiff was HIV positive but also stated that he was in "reasonably good status." (Tr. 105.) The doctor noted Plaintiff had "[n]o hospitalization for any opportunistic infections"[16] and made no notations in the "Repeated Manifestations of HIV Infection" section. (Id.) The doctor's report indicated that Plaintiff had no restrictions on activities of daily living, no difficulties in maintaining social functioning, and did not suffer from deficient concentration, persistence, or pace and had no difficulty completing tasks. (Id.)

**2.** **Dr. James M. Brown**

On December 6, 1996, Dr. Brown, a radiologist, x-rayed Plaintiff's chest. The x-rays revealed Plaintiff's partially elevated diaphragm,[17] but also indicated that his lungs were clear and his heart and mediastinal[18] structures were normal. (Tr. 118.) Dr. Brown also ran a

---

[16] An opportunistic infection is "an infection caused by normally nonpathogenic organisms in a host whose resistance has been decreased by disorders such as HIV. People with HIV are particularly susceptible to such infections." MOSBY'S at 1150.

[17] A diaphragm is "a dome-shaped musculofibrous partition that separates the thoracic and abdominal cavities." MOSBY'S at 482. "There are many causes for an elevated diaphragm. It can include things in the belly that irritate it and cause it to be elevated, collapse of part of the lung that pulls it up, or loss of the nerves that cause it to be weak. Often it is asymptomatic and no treatment is needed for the diaphragm itself. However, the underlying cause of the elevated diaphragm may require treatment." Netwellness Consumer Health Information, http://www.netwellness.org/question.cfm/52525.htm.

[18] Mediastinal means "pertaining to a median septum or space between two parts of the body, such as the interval between the pleural sacs." MOSBY'S at 100.

pulmonary function test[19] which revealed that prior to bronchodialtors[20] Plaintiff had a one second forced expiratory volume[21] ("FEV1") of 0.53 and after bronchodialtors a FEV1 of 1.74. (Tr. 113-16.)

### 3. Dr. Salvatore Milazzo

On December 6, 1996, Dr. Milazzo evaluated Plaintiff.  (Tr. 121.)  Plaintiff complained of:  night sweats, occasional thrush, muscle aches and cramps, daily diarrhea, discomfort while sitting, and his inability to walk more than one block or up one flight of stairs before the onset of fatigue.  (Id.)  Dr. Milazzo administered an electrocardiogram[22] ("EKG") revealing Plaintiff's normal sinus rhythm.[23]  (Tr. 122.)  He also administered a chest x-ray which was normal.  (Tr. 122.)  Though Plaintiff had an abnormal pulmonary function test showing an obstructive disorder,[24] his overall health was "normal."  (Id.)

---

[19] A pulmonary function test is "a procedure for determining the capacity of the lungs to exchange oxygen and carbon dioxide efficiently." MOSBY'S at 1355.

[20] A bronchodialtor is "a substance, especially a drug, that relaxes contractions of the smooth muscle of the bronchioles to improve ventilation to the lungs." MOSBY'S at 230.

[21] Forced expiratory volume is "the volume of air that can be forcibly expelled in a fixed period after full inspiration." MOSBY'S at 652.

[22] An electrocardiogram is "a graphic record produced by an electrocardiograph." MOSBY'S at 542.  An electrocardiograph is "a device used for recording the electrical activity of the myocardium to detect transmission of the cardiac impulse through the conductive tissues of the muscle." Id.

[23] A sinus rhythm is "a cardiac rhythm stimulated by the sinus node. A rate of 60-100 beats/min is normal." MOSBY'S at 1497.

[24] An obstructive disorder "refers to chronic lung disorders that result in blocked air flow in the lungs."  About.com, http://adam.about.com/encyclopedia/COPD-Chronic-Obstructive-Pulmonary-Disorder.htm.

### 4.   **Dr. B. Mirti**

On January 8, 1997, Dr. Mirti of the New Jersey Division of Disability Determination Services reviewed Plaintiff's file for an RFC assessment.  (Tr. 123-30.)  Dr. Mirti's report indicated that Plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation.  (Tr. 127.)  The doctor also noted that the EKG and Complete Blood Count Test ("CBC")[25] results were normal and there were no indications of any opportunistic infections.  (Tr. 130.)  He concluded that Plaintiff could occasionally lift and carry 50 pounds, frequently lift and carry up to 25 pounds, and stand, walk, or sit for approximately 6 hours of an 8 hour workday.  Dr. Mirti also cited that Plaintiff had the unlimited ability to push or pull,  occasionally climb, and frequently balance, stop, kneel, crouch and crawl.  (Tr. 124-25.)

### 5.   **Dr. Nina Regevik**

On February 7, 1997, Dr. Regevik of the Newark Department of Health and Human Services examined Plaintiff.  (Tr. 134.)  She noted his "chronic fatigue, chronic diarrhea, pains/cramps in legs" and gave him a "poor" prognosis.  (Id.)  She also estimated that it would be "over six months" before Plaintiff would be capable of returning to work.  (Id.)

### 6.   **Saint Michael's Medical Center**

On February 11, 2007 at Saint Michael's Medical Center, a doctor (whose illegible signature makes him unidentifiable) examined Plaintiff.  (Tr. 171.)  Plaintiff complained of HIV, leg pain, headache, diarrhea, shortness of breath and fatigue.  (Tr. 171-72.)  In the "History of

---

[25] A Complete Blood Count Test is "a determination of the number of red and white blood cells per cubic millimeter of blood."  MOSBY'S at 375.

9

Present Illness" section of the form recapitulating the visit, the physician noted that Plaintiff self-reported "last CD4-38?"[26]   (Tr. 173.)  No objective evidence exists in the record to support the Plaintiff's statement.

**7.    Dr. John R. Middleton and Dr. Iris Mentle**

On March 3, 1998 Plaintiff underwent an EKG that revealed a thickened mitral valve,[27] normal aortic valve,[28] mildly impaired left ventricle systolic function,[29] and traces of pericardial effusion[30] and mitral regurgitation.[31]  (Tr. 188-89.)

---

[26] CD4-38 indicates a CD4 count of 38.
The CD4 count tells your doctor how strong your immune system is, how far HIV disease has advanced (the stage of the disease), and helps predict the risk of complications and debilitating infections. The CD4 count is most useful when it is compared with the count obtained from an earlier test. Normal CD4 counts in adults range from 500 to 1,500 cells per cubic millimeter of blood. In general, the CD4 count goes down as HIV disease progresses. Any single CD4 count value may differ from the last one even though your health status has not changed. You should not place too much importance on any one result. What is more important than any single value is the pattern of CD4 counts over time.

Lab Tests Online®, http://www.labtestsonline.org/understanding/analytes/cd4/test.html.

[27] A mitral valve is "a bicuspid valve situated between the left atrium and the left ventricle; the only valve with two rather than three cusps.  The mitral valve allows blood to flow from the left atrium into the left ventricle but prevents blood from flowing back into the atrium." MOSBY'S at 1040.

[28] An aortic valve is "a valve in the heart between the left ventricle and the aorta." MOSBY'S at 112.

[29] Systolic means "pertaining to or resulting from a heart contraction."  MOSBY'S at 1583.

[30] A pericardial effusion is "a collection of blood or other fluid into the pericardium." MOSBY'S at 1236.  The pericardium is "a fibroserous sac that surrounds the heart and the roots of the great vessels."  MOSBY'S at 1237.

[31] Mitral regurgitation is "a backflow of blood from the left ventricle into the left atrium in systole across a diseased valve."  MOSBY'S at 1040.

10

**8.    Hospitalization**

On April 21, 1998,[32] Plaintiff was hospitalized for two weeks and diagnosed with pnuemocystosis pneumonia,[33] esophageal candidiasis,[34] candidiasis of the mouth,[35] and herpes simplex.[36]  (Tr. 183.)

### III. DISCUSSION

**A.    Standard of Review**

This Court has jurisdiction to review the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of

---

[32] ALJ O'Leary found Plaintiff to be disabled and entitled to both SSI and DIB from this date forward.

[33] Pnuemocystosis is "a type of interstitial plasma cell pneumonia in which the alveoli become honeycombed with an acidophilic material. The patient may or may not be febrile but usually is weak, dyspneic, and cyanotic."  MOSBY'S at 1280.

[34] Esophageal candidiasis "is a fungal or yeast infection of the esophagus."  Healthline℠, http://www.healthline.com/channel/esophageal-candidiasis.html.

[35] Candidiasis "is a fungal infection that occurs when there is overgrowth of fungus called Candida."  Wrong Diagnosis, http://www.wrongdiagnosis.com/medical/oral_candidiasis.htm.

[36] Herpes simplex is "an infection caused by a herpes simplex virus, which has an affinity for the skin and nervous system and usually produces small transient irritating and sometimes painful fluid-filled blisters on the skin and mucous membranes."  MOSBY'S at 757.

evidence but may be less than a preponderance." Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

In the determination of whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age."  Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).  Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion.  Blalock, 483 F.2d at 775.

**B.**    **Statutory Standards**

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  To qualify for Disability Insurance Benefits (DIB) or SSI benefits, a claimant must first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

C.      **The Five Step Evaluation Process and the Burden of Proof**

        Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[37]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled" and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

        At step two, the Commissioner must determine whether the claimant suffers from a severe impairment.  20 C.F.R. § 404.1520(a)(ii)(c).  An impairment is severe if it "significantly

---

        [37] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

limits [a claimant's] physical or mental ability to do basic work activities." Id.  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  See id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[38] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.  (Id.)  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing." Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional

---

[38] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to

perform his past relevant work, he will not be found disabled under the Act.  In Burnett, the

Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional
> capacity enables her to perform her past relevant work. This step involves three
> substeps: (1) the ALJ must make specific findings of fact as to the claimant's
> residual functional capacity; (2) the ALJ must make findings of the physical and
> mental demands of the claimant's past relevant work; and (3) the ALJ must
> compare the residual functional capacity to the past relevant work to determine
> whether claimant has the level of capability needed to perform the past relevant
> work.

Burnett, 220 F.3d at120.  If the claimant is unable to resume his past work, and his condition is

deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must

demonstrate that there are other jobs existing in significant numbers in the national economy

which the claimant can perform, consistent with his medical impairments, age, education, past

work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds

a significant number of jobs that claimant can perform, claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the

Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the

burden of establishing the existence of jobs in the national economy.  These guidelines dictate a

result of "disabled" or "not disabled" according to combinations of vocational factors, such as

age, education level, work history, and residual functional capacity.  These guidelines reflect the

administrative notice taken of the jobs in the national economy that exist for particular

combinations of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph

200.00(b).  When a claimant's vocational factors, as determined in the preceding steps of the

evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual is disabled. 20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 462 (1983). The claimant may rebut any finding of fact as to a vocational factor. 20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled." Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). Moreover, "the combined impact of the impairments will be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003). However, the burden still remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits. See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. Jun. 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the decision. See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006). Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format." Id.

16

**D.** **Subjective Complaints of Pain**

An ALJ may not ignore a claimant's subjective complaints of pain when evaluating a

disability claim. Dorf v. Bowen, 794 F.2d 896, 902 (3d Cir. 1986).  Although there must be

objective medical evidence of a condition which could produce pain, objective evidence of pain

itself is not required.  Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).  The Third

Circuit requires:

> (1) that subjective complaints of pain be seriously considered, even where
> not fully confirmed by objective medical evidence; (2) that subjective pain
> "may support a claim for disability benefits" and "may be disabling;" (3)
> that when such complaints are supported by medical evidence, they should
> be given great weight; (4) that where a claimant's testimony as to pain is
> reasonably supported by medical evidence, the ALJ may not discount
> claimant's pain without contrary medical evidence.

Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) (citations omitted).  An individual's

description of his or her pain or symptoms,  although relevant, is not conclusive in itself.

42 U.S.C. § 423(d)(5)(A); see 20 C.F.R. § 404.1529(b) (stating that symptoms alone "will not be

found to affect [the claimant's] ability to do basic work activities unless medical signs or

laboratory findings show that a medically determinable impairment(s) is present"); Sassone v.

Comm'r of Soc. Sec., 165 F. App'x 954, 956 (3d Cir. 2006).

**E.** **Seven Part Test for Considering Pain**

According to Social Security Ruling 96-7p and 20 C.F.R. §§ 404.1529, 416.929, the

seven factors used to evaluate a claimant's allegation of pain are (i) the extent of daily activities;

(ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating

and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication;

(v) treatment other than medication for the symptoms; (vi) measures used to relieve pain or other

symptoms; and (vii) other factors concerning functional limitations and restrictions due to pain or

17

other symptoms.  <u>Canales v. Barnhart</u>, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

**F.      Weight Accorded to Evidence**

The Secretary considers all submitted opinions to evaluate a claim for disability benefits.

If the medical evidence presented is inconsistent, then the evidence will be weighed in order to

reach a decision.  <u>See</u> 20 C.F.R. § 404.1527.  The greatest weight is accorded to medical

opinions of the treating physicians.  In reviewing a decision by the Secretary, "a court gives

greater weight to the findings of a treating physician than to the findings of a physician who has

examined a claimant only once or not at all."  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1067 (3d Cir.

1993).  Controlling weight is given when a treating physician's opinion is "well supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence."  20 C.F.R. § 404. 1527(d)(2).  When a treating physician's

opinion is not "well supported" the length and frequency of treatment is considered.  The more

frequently examined and closely followed a claimant has been, the greater weight his attending

doctor's opinion will carry.  The more evidence produced in support of a medical opinion and

consistency with the entire record, generally the greater the weight it will receive regardless of

whether the physician is a specialist.  20 C.F.R § 404.1527(d)(3)-(5).

**G.   ALJ O'Leary's Findings**

ALJ O'Leary performed the five step evaluation and concluded that within the time

period in question Plaintiff was not disabled, as defined by the Social Security Act.  (Tr. 383.)

**1.   *Step One***

After he was released from prison in July 1996, Plaintiff was employed for three months

in a warehouse but left because he was no longer capable of performing the physical

requirements of the job.  (Tr. 384.)  ALJ O'Leary found that this represented an unsuccessful

work attempt and, therefore, Plaintiff had not engaged in substantial gainful activity since July 1, 1996.  (Id.)

**2.** ***Step Two***

ALJ O'Leary found Plaintiff's HIV positive status during the time period in question qualified as a severe impairment within the meaning of the Social Security Act.  (Tr. 388.)

**3.** ***Step Three***

Based on the medical evidence  presented, ALJ O'Leary reasoned that Plaintiff's HIV infection did not meet or medically equal any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 388).

**4.** ***Step Four***

ALJ O'Leary found that Plaintiff had an RFC of medium work  (Tr. 390.)  This assessment was based on ALJ O'Leary's review of  "the findings of the State Agency physicians[,] . . . the consultative examination [of] Dr. Salvatore Milazzo[,]" and consideration of Plaintiff's subjective complaints.  (Tr. 389-90.)  ALJ O'Leary concluded that if Plaintiff was capable of performing a full range of medium work, he could also perform the light work required by his previous job as a courier.  (Tr. 390.)

**5.** ***Step Five***

ALJ O'Leary did not perform this step of the evaluation since he determined in Step 4 that the Plaintiff  "retained the capacity to perform his past relevant work as a courier/driver as he performed the job, and as it is generally performed in the national economy."  (Tr. 390.)

# IV. ANALYSIS

Plaintiff contends that ALJ O'Leary's decision should be reversed because "substantial evidence in the administrative record establishes entitlement and eligibility for and to the benefits applied for." (Br. In Support of Pl. David Font [hereinafter "Pl's Br."].)  Alternatively, Plaintiff argues that the case should be remanded because the ALJ's decision was not supported by substantial evidence.  (Pl's Br. 14.)  Plaintiff disagrees with the ALJ's proposition that his impairment does not qualify as a listed impairment. (Pl's Br. 26.) Plaintiff also contends that the ALJ offers no articulated evidentiary basis for his RFC assessment.[39]  (Pl's Br. 22.)  This Court finds that there is substantial evidence to support ALJ O'Leary's determination and his determination shall be affirmed.

## Listed Impairment

At the third step, the ALJ considered whether the impairment is contained in the "Listing of Impairments" set forth at 20 C.F. R. § 404, Subpart P, Appendix 1, or if it is equal to a listed impairment.  The ALJ evaluated all of the medical evidence presented and determined that the impairment was not included in the listings and was not the equivalent of one of the listings.  Plaintiff disputes this finding but offers no arguments or objective medical evidence as to why it is incorrect.[40]

---

[39] It does not appear that Plaintiff objects to Steps 1 and 2 of ALJ O'Leary's analysis.

[40] Plaintiff argues that he suffers from "an HIV infection, chronic obstructive pulmonary disease, PCP pneumonia, headaches, vomiting, night sweats, candidiasis of mouth and esophagus, herpes simplex, oral thrush and psychiatric overlay" and therefore "[c]learly meets the standards set forth in the listings." (Pl's Br. 23.)  However, in listing these conditions, Plaintiff argues based upon his *current* conditions.  (Id.)  The issue here is whether there is adequate evidence of a disability prior to April 21, 1998.  The record does not support Plaintiff's claim that he suffered from all of these conditions at that time.

The ALJ's conclusion is supported by substantial evidence.  The listings explicitly state that an HIV infection alone will not qualify as an impairment.  20 C.F.R. § 404, Subpart P, Appendix 1, § 14.00(a)(1)(c).  In order to qualify, an HIV infection must be complemented by documentation of one of forty-five other conditions; for example, Syphilis, Aspergillosis, Histoplasmosis, Toxoplasmosis.  Id. at § 14.08.  There is no question that Plaintiff suffered from HIV for the entire time period for which benefits are sought.  However, the record does not support a finding that he suffered from an adequate secondary condition to meet the requirements of the listings.

Dr. Rizvi's examination of Plaintiff indicated that he was in "reasonably good" condition for a person with HIV.  Dr. Brown's and Dr. Milazzo's examinations showed a normal sinus rhythm and revealed no abnormalities in a chest x-ray.  Although Plaintiff's FEV1 level suggested an "obstructive disorder" in his pulmonary function, Dr. Milazzo nevertheless concluded that the exam was "basically normal" since all the other tests revealed normal or close-to-normal results.  (Tr. 122.)  Additionally, an obstructive disorder, when considered alongside HIV, does not meet or medically equal any of the listings.[41]

During the entirety of the relevant time period, Plaintiff had only one doctor who indicated that his situation was serious. Dr. Regevik indicated a diagnosis of "chronic fatigue, chronic diarrhea, pains/cramps in legs" with a prognosis of "poor."  (Tr. 134.)  She further indicated that she would estimate a hiatus of "over six months" until Plaintiff would be capable

---

[41] Although Plaintiff is not required to do so, this Court notes that Plaintiff does not indicate which listing, if any, he believes to be equivalent to his condition.  See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 n.2 (3d Cir. 2000).  The ALJ, as required, referred back to the listings and explained which listings Plaintiff did not satisfy and why.  (Tr. 388.)  See Burnett, 220 F.3d at 119 (indicating that at step three, the ALJ's decision should "identify . . . the relevant listed impairments, discuss . . . the evidence, [and] explain . . . the ALJ's reasoning.").

of returning to work.  (Id.)  The ALJ examined this information, as required, and provided an explanation as to why he chose to reject it.  See Cotter, 642 F.2d at 706-07 (indicating that the rejection of any evidence must be explained for the benefit of a reviewing court).  The ALJ rejected Dr. Regevik's diagnosis because it conflicts with the evaluations of the other doctors, does not contain any objective evidence to support her conclusions, does not explain the conclusion that Plaintiff would be unable to work for six months, and makes a determination within the Commissioner's purview.  (Tr. 385-86.)

This decision is supported by substantial evidence. The examinations of Dr. Rizvi and Dr. Milazzo indicated that Plaintiff was in a normal condition for a person with HIV.  Dr. Regevik, however, indicated that Plaintiff's situation was much more dire. Since the competing evaluations were amply supported by objective medical evidence, the ALJ rejected Dr. Regevik's evaluation.  It is noteworthy that Dr. Feshner,[42] testifying as an expert at Plaintiff's hearing, agreed  with the conclusion that Dr. Regevik's examination was outweighed by other considerations.[43] (Tr. 345-46.)

The ALJ also considered Plaintiff's evaluation from Saint Michael's Medical Center, in which Plaintiff complained of numerous conditions and stated that he had a CD-4 count of 38. (Tr. 386.)  At the January 26, 2001 hearing before the ALJ, Plaintiff's counsel relied heavily on this CD-4 count and questioned Dr. Feshner about it at length.  (Tr. 346-50.)  However, as the ALJ noted, Plaintiff's CD-4 count had a question mark next to it and lacks any supportive

---

[42] Dr. Feshner was the medical expert who testified at the January 26, 2001 hearing.  (Tr. 343.)

[43] Plaintiff is seeking benefits dating from July 1996. Even if the ALJ accepted Regevik's diagnosis as definitive, it would only have been effective from February 7, 1997, the date that the examination took place.

medical documentation.  Despite the ALJ's request for documentation of this test outcome and despite his decision to give Plaintiff thirty days after the hearing to provide this documentation, Plaintiff never came forward with any objective medical evidence to support his claim regarding his CD-4 count.  (Tr. 386.)

The ALJ is required to place a significant amount of emphasis on objective evidence, and his decision to ignore Plaintiff's unsupported claim of a CD-4 count of 38 is a reasonable evaluation of the evidence under the circumstances.  20 C.F.R. § 404.1529(a).  With regard to the CD-4 count, Plaintiff simply failed to provide objective medical evidence and meet his burden of proof.

Additionally, it is worth noting that even if Plaintiff's claims to doctors during the relevant period are assumed to be accurate, they do not meet or medically equal any listing. Plaintiff complained of diarrhea, thrush, leg pain and cramps, headaches, and fatigue.  None of these, however,  even when considered with Plaintiff's HIV, meet or equal any listing.  During the relevant time period, Plaintiff was not diagnosed with any of the additional ailments necessary for HIV to qualify as an impairment.  See 20 C.F.R. § 404, Subpart P, Appendix 1, § 14.08.  Although he complained of chronic diarrhea, the record does not indicate that Plaintiff's diarrhea was so severe as to require intravenous hydration, intravenous alimentation, or tube feeding as the listings require.  See id.  Additionally, Dr. Rizvi's report explicitly ruled out the possibility that Plaintiff suffered from restrictions of activities of daily living, difficulties in maintaining social functioning, or difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  (Tr. 105.)

For the relevant time period, Plaintiff provided  no objective evidence that his impairment reached a level of severity set forth within the listings.  Plaintiff points to the symptoms that he

reported to doctors at the time, but fails to point to any objective evidence of the severity of these symptoms.  The ALJ decided that Plaintiff did not meet his burden for this step.  The ALJ's decision was based on substantial objective medical evidence.

**Past Relevant Work**

At the fourth step, the ALJ considered whether Plaintiff possessed the RFC to engage in his past relevant work.  In doing so, the ALJ relied upon Dr. Mirti's review of Plaintiff's record, in which Dr. Mirti determined that Plaintiff could occasionally lift and carry fifty pounds; frequently lift and carry up to twenty-five pounds; and stand, walk, or sit for approximately six hours of an eight hour workday.  (Tr. 386-87.)  This evaluation was weighed against Plaintiff's own testimony, in which he stated that he suffered from headaches, poor sleeping patterns, weakness, and chronic diarrhea during the relevant period.  (Tr. 389.)  Ultimately, the ALJ chose to adopt Dr. Mirti's full findings because Plaintiff could not present any objective medical evidence supporting his subjective complaints.  (Id.)

While considering Plaintiff's capabilities during this time period, the ALJ also took into account Plaintiff's subjective complaints of pain.  (Tr. 389.)  However, the ALJ rejected  these complaints due to the absence of any objective medical evidence.  This determination is within the discretion of the ALJ and was proper in this circumstance.  When considering a claim of pain, the ALJ only needs to consider what "can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(a).  "No symptom or combination of symptoms can be the basis for a finding of disability . . . unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms."  (SSR). 96-7p.  Even in situations where the subjective complaint of pain is supported by medical evidence, the ALJ

can reject the complaint of pain if it lacks credibility.  Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

Here, Plaintiff  complained that he was unable to work because the pain was too severe as a result of headaches, poor sleeping patterns, and general weakness.  (Tr. 389.)  However, the ALJ was entitled to reject these claims due to the absence of any objective medical evidence supporting these symptoms.

The ALJ concluded that Plaintiff was capable of performing a full range of medium work. (Tr. 390.)  "Medium work involved lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds."  20 C.F.R. § 404.1567(c).  If a person is capable of performing medium work, then he is deemed also capable of performing light and sedentary work.  Id.  The conclusions of Dr. Mirti's report on Plaintiff are consistent with a finding that he could perform a full range of medium work.  Plaintiff's past relevant work was his job as a courier for various law firms in Newark.

He has filed two reports with conflicting descriptions of the work that he had performed. In his disability report of October 1, 1996, Plaintiff indicated that his work involved five daily hours of walking, frequent bending and reaching, and no lifting or carrying.  (Tr. 70.)  However, in a later disability report, filed on October 22, 1999, he indicated that he would  "frequently need to carry fifty pound bins for delivery.  (Tr. 215.)  According to the Dictionary of Occupational Titles, upon which the ALJ is permitted to rely, work as a courier/messenger requires only light exertion.  20 C.F.R. § 404.1560(b)(2); United States Department of Labor, Dictionary of Occupational Titles § 230.663-010.

The ALJ's decision that Plaintiff was capable of performing a full range of medium work, and could therefore perform the light work required in his previous job as a courier, was based

upon substantial evidence.  Plaintiff's medical history does not indicate any objective evidence of impairments during the relevant period that would have precluded Plaintiff from working as a courier.  Dr. Rizvi and Dr. Milazzo both determined that Plaintiff was in normal condition and did not suffer from any exceptional ailments other than HIV.  Dr. Mirti's review of Plaintiff's file rendered results that are consistent with a capability of performing a full medium range of work.  Dr. Regevik's examination of Plaintiff found him to be in poor condition and unable to work, but her determinations were contrary to those of other doctors and were permissibly rejected due to the absence of objective data.

### **Other Work- Step Five**

Since the ALJ determined that Plaintiff was capable of performing his past relevant work during the time period in question, and was not disabled during that period, the ALJ did not need to reach Step 5 of the analysis.  Since this Court finds that the decision of the ALJ was based on substantial evidence, there is no need to consider the fifth step analysis.  See Bowen, 482 U.S. at 146 n.5 (there is no need to consider the fifth step when the outcome is determined by earlier steps).

### **IV. CONCLUSION**

For the reasons stated above, this Court finds that Commissioner's decision is supported by substantial evidence and is affirmed.

    S/Joseph A. Greenaway, Jr.
    JOSEPH A. GREENAWAY, JR., U.S.D.J.


Date:  March 31, 2009